## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

In the Matter of:

P & S DISTRIBUTORS, INC.,
              Debtor.

CHAPTER 11 PROCEEDING
CASE NUMBER: 12-22142-dob
HON. DANIEL S. OPPERMAN

_____/

## DEBTORS AMENDED COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT

## I. INTRODUCTION

NOW COMES the Debtor in the above-captioned matter ("Debtor"), by and through its counsel, Kane, Funk & Poch, P.C., and proposes the following Combined Plan of Reorganization and Disclosure Statement (the "Plan") in accordance with 11 U.S.C. § 1121 (a). Pursuant to an Order of the Court issued September 7, 2012 the Disclosure Statement may be combined with the Plan into one document as set forth herein, and the hearing regarding approval of the Disclosure Statement and the hearing regarding confirmation of the Plan shall be combined. [Docket No. 27].

This case was filed as a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Code") on July 12, 2012. The Debtor is authorized to continue to operate its business, as a debtor-in-possession, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No request for appointment of a Chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

The Debtor's reorganization in this bankruptcy proceeding is based upon income from

operations and use of cash collateral of Target Alpena Development Corporation ("Target Alpena"), the Debtor's primary prepetition lender.

The liquidation analysis, distribution projections, and other information in this Plan are estimates only, and the timing and amount of actual distributions to allowed claim holders may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate. Claims holders may not rely on this Plan for, and this Plan does not provide, any legal, financial, regulatory, tax, or business advice. The Debtor urges each claim holder to consult with its own advisors with respect to any such legal, financial, regulatory, tax, or business advice in reviewing this Plan.

## II.    DEFINITIONS

For purposes of this Plan, except as expressly provided otherwise or unless the context requires otherwise, all capitalized terms not otherwise defined shall have the meanings set forth herein. Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning set forth in the Bankruptcy Code or the Bankruptcy Rules.

1. "**Administrative Claim**" means a claim for payment of an administrative expense of a kind specified in Section 503(b) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(2) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estate and operating the businesses of the Debtor, including wages, salaries, or commissions for services rendered after the Petition Date, professional fees, all fees and charges assessed against the Estate under Chapter 123

of title 28, United States Code, and all allowed claims that are entitled to be treated as Administrative Claims pursuant to a final order of the Bankruptcy Court.

2.      **"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended and codified in Title 11 of the United States Code, 11 U.S.C. §§101-1532, as applicable in this Chapter 11 case.

3.      **"Bankruptcy Court"** means the United States Bankruptcy Court for the Eastern District of Michigan, Northern Division, or such other court as may have jurisdiction over this Chapter 11 case.

4.      **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 case or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 case or proceedings therein, as the case may be.

5.      **"Bar Date"** means the deadlines established by the Bankruptcy Court for filing proofs of claim in the Chapter 11 case, as the context may require.

6.      **"Confirmation Date"** means the date 14 days after entry of the Confirmation Order.

7.      **"Confirmation Hearing"** means the hearing before the Bankruptcy Court, held under Section 1128 of the Bankruptcy Code, to consider confirmation of this Plan and related matters, as such hearing may be adjourned or continued from time to time.

8.      **"Confirmation Order"** means the order entered by the Bankruptcy Court confirming this Plan under Section 1129 of the Bankruptcy Code.

9.      **"Debtor"** means the debtor identified in the caption to this pleading.

10.    "**Effective Date**" means the date upon which the Order Confirming Plan becomes a final non-appealable Order.

11.    "**Estate**" means the bankruptcy estate of the Debtor created pursuant to Section 541 of the Bankruptcy Code.

12.    "**Petition Date**" means July 12, 2012, the date the Debtor filed its petition for reorganization relief in the Bankruptcy Court.

13.    "**Plan**" means this Combined Plan of Reorganization and Disclosure Statement as herein proposed by the Debtor including any Plan Supplement, all exhibits, and schedules thereto, either in its or their present form or as the same may be further altered, amended, or modified from time to time in accordance with the Bankruptcy Code and Bankruptcy Rules.

14.    "**Reorganized Debtor**" means the Debtor as reorganized after the Confirmation Date pursuant to the provisions of this Plan.

15. "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs filed in this Chapter 11 case by the Debtor, as such schedules or statements have been or may be further modified, amended, or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.


## III.    DEBTOR'S PLAN OF REORGANIZATION

A.    **Classification of Claims and Interest**

Class 1    Administrative claims, asserted against the Estate, as the same are filed, allowed, and ordered paid by the Court.

Class 2    The secured claim of Target Alpena, to the extent that such claim is allowed and ordered paid by the Court.

Class 3  The priority claim of the Internal Revenue Service to the extent that such claim is allowed and ordered paid by the Court.

Class 4  The priority claim of the State of Michigan, Department of Treasury to the extent that such claim is allowed and ordered paid by the Court.

Class 5  General unsecured claims and any portions of other claims asserted as priority or secured which are entitled to unsecured treatment against the Estate that were timely filed, to the extent the same are allowed, approved, and ordered paid by the Court.

Class 6  The equity interest in the Debtor corporation held by Kenneth Tessmer.

## B.  Treatment of Classes under the Plan

### Class 1 - Administrative Claims

- Treatment: The administrative claims asserted against the Estate shall be paid in full, as negotiated between the administrative claimants and the Debtor. This class will include the professional fees of the Debtor including attorney fees and accounting fees. An administrative claim was filed by the State of Michigan, Department of Treasury.

- Projected recovery under the Plan: 100%.

- Voting: This class is unimpaired under the Plan and deemed to have accepted the Plan under Bankruptcy Code section 1126(f). Therefore this class is not entitled to vote on the Plan.

### Class 2 - Secured Claim of Target Alpena

- Treatment: Per the Debtor's Schedules and the Proof Claimed filed by Target Alpena, Target Alpena holds a secured claim against the Estate in the amount of $27,424.64.

This Debtor executed a Promissory Note and a Security Agreement in favor of Target Alpena. Target Alpena's claim is collateralized by a first lien on all assets of the Debtor, including the sale proceeds of sold inventory. This claim shall be amortized over eight and a half years at 5.00% interest. Payments shall be in the amount of $338.20 per month, commencing on the first day of the month following the Effective Date of the Plan and this claim shall be due in full, eight and a half years from the date of confirmation of the Chapter 11 Plan. Target Alpena of Northern Michigan shall retain all of its liens in the same order and priority as said liens existed pre-petition.

- Projected recovery under the Plan: 100%.
- Voting: This class is impaired under the Plan and therefore entitled to vote.

Class 3 - Claim of Internal Revenue Service

- Treatment: Per the Proof of Claim filed by the Internal Revenue Service ("IRS"), the IRS holds a claim in the amount of $33,313.33; of the total amount $30,842.58 of the claim IRS's claim is perfected by a Federal Tax Lien placed on the real estate. This claim is disputed by the Debtor in that the claim includes an unassessed liability for corporate income tax for the year 2012 and an unassessed liability for corporate from 941. This claim shall be treated as fully secured and will be paid in a manner not less favorable than that provided in 11 U.S.C. § 1129(a)(9)(C) in not more than five years from the Petition Date. The Debtor will pay this claim in quarterly payments on the 30th of June, the 30th of September, the 31st of December, and the 31st of March through and including June 30, 2017. Payments will commence on the first quarter following the Effective Date of the Debtor's Chapter 11 Plan. The IRS shall

retain all its liens in the same order and priority as said liens existed pre-petition. Furthermore, in the event a new lender is secured to take out Target Alpena, at any time during the course of the Debtor's Chapter 11 Plan, this claim shall automatically be subordinated to the new lender.

- Projected recovery under the Plan: 100%.
- Voting: This class is impaired under the Plan and therefore entitled to vote.

Class 4 - Claim of State of Michigan, Department of Treasury

- Treatment: Per the Debtor's Schedules and the Proof of Claim filed by the State of Michigan, Department of Treasury ("State of Michigan"), State of Michigan holds a claim in the amount of $14,267.94. This claim shall be treated as secured in the amount of $11,683.31, and $2,584.63 shall be considered a priority claim. This claim shall be treated as fully secured and will be paid in a manner not less favorable than that provided in 11 U.S.C. § 1129(a)(9)(C) in not more than five years from the Petition Date. The Debtor will pay this claim in quarterly payments on the 30th of June, the 30th of September, the 31st of December, and the 31st of March through and including June 30, 2017. Payments will commence on the first quarter following the Effective Date of the Debtor's Chapter 11 Plan. The State of Michigan shall retain all its liens in the same order and priority as said liens existed pre-petition. Furthermore, in the event a new lender is secured to take out Target Alpena, at any time during the course of the Debtor's Chapter 11 Plan, this claim shall automatically be subordinated to new lender.
- Projected recovery under the Plan (on secured claim): 100%.

- Voting: This class is impaired under the Plan and therefore entitled to vote.

Class 5 - General unsecured claims and any portions of other claims asserted as priority or secured which are entitled to unsecured treatment against the Estate that were timely filed, to the extent the same are allowed, approved, and ordered paid by the Court.

- Treatment: General unsecured claims shall be paid an amount equal to 46% of their claims upon the Effective Date of the Plan which payment shall constitute payment in full of the unsecured claims in this class. Payments shall be paid in quarterly installments in the amount of $605.00 per quarter commencing with the quarter of September 30, 2013. These payments shall continue on March 31st, June 30th, September 30th, and December 31st through and including June 30, 2019. The amounts received by unsecured creditors at the end of twenty quarters shall constitute payment in full of the unsecured claims herein. Estimated percentage paid to Class 5 creditors is 46% of the allowed claims. The unsecured claims that comprise Class 5 are listed hereto on Exhibit "A".

- Projected recovery under the Plan: 46%.

- Voting: This class is impaired under the Plan and therefore entitled to vote on the Plan.

Class 6 - The equity interest in the Debtor corporation held by Kenneth Tessmer.

- Treatment: Kenneth Tessmer shall retain his equity interests in the Debtor corporation.

- Projected recovery under the Plan: 100%

- Voting: This class is unimpaired under the Plan and deemed to have accepted the Plan under Bankruptcy Code section 1126(f). Therefore this class is not entitled to vote on the Plan.

## C.      Impaired Classes under the Plan

Under Section 1126(c) of the Bankruptcy Code, and except as otherwise provided in

Section 1126(e) of the Bankruptcy Code, an impaired class of claims has accepted the Plan if the holders of at least two-thirds in dollar amount and more than one-half in number of the allowed claims in such class actually voting have voted to accept the Plan. All classes except Classes 1 and 6 are impaired under the Plan.

### D.    Payment of U.S. Trustee's Fees

Immediately upon Confirmation of this Plan, the Debtor will pay all fees due and owing to the U.S. Trustee's Office which have been incurred up to that date, but have not been paid. The Debtor shall serve upon the U.S. Trustee post-confirmation receipt and disbursement reports on a monthly basis, until such time as the case is closed with the Court. The Debtor shall continue to pay quarterly fees to the U.S. Trustee on a timely basis until such time as the case is closed with the Court.

### E.    Executory Contract and Unexpired Lease Assumption and Rejection

#### 1.    Assumption and Rejection

The only executory contract to which the Debtor is a party is an executory contract with United States Industrial, the Debtor in companion case (Case No. 12-22150) which constitutes the rental of the real estate for this Debtor's business. Debtor assumes this executory contract as of the date of the entry of the order confirming this Plan. However, it is important to note that this Debtor, in conjunction with a mortgage and guaranty agreement executed by US Industrial, Inc., executed a Promissory Note and Security Agreement in favor of Target Alpena; therefore, Target Alpena is a secured creditor and payment terms are described above under Class 2.

#### 2.    Cure of Defaults

At present, the Debtor does not believe any of the executory contracts or leases to be assumed have outstanding liabilities in need of cure as provided in Section 365. If there is a dispute regarding (a)

the nature or amount of any cure, (b) the ability of the reorganized Debtor, or any assignee to provide "adequate assurance of performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to the assumption, the cure shall occur following the entry of a final order resolving the dispute and approving the assumption or assumption and assignment, as the case maybe; provided, however, if there is a dispute as to the amount of cure that cannot be resolved consensually among the parties, the Debtor shall have the right to reject the contract or lease for a period of five (5) days after entry of a final order establishing a cure amount in excess of that provided by the Debtor.

3.      Claims Based on Executory Contract or Unexpired Lease Rejection

If the rejection by a Debtor, pursuant to the Plan or otherwise, of an executory contract or unexpired lease results in a claim, then such claim shall be forever barred and shall not be enforceable against the Debtor or reorganized Debtor, or the properties of either of them unless a proof of claim is filed with the Court within thirty [30] days after the later of (a) the Confirmation Date or (b) notice that the executory contract or unexpired lease has been rejected, unless otherwise ordered by the Bankruptcy Court. Any proofs of claim arising from the rejection of the Debtor's executory contracts or unexpired leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Reorganized Debtor. All allowed claims arising from the rejection of unexpired leases and executory contracts shall be classified as general unsecured claims and shall be treated in accordance treatment provided for such claims under the Plan.

4.      Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan nor anything contained in the Plan shall constitute an admission by the Debtor that any such contract or lease is in fact an

executory contract or unexpired lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor shall have thirty (30)days following entry of a final order resolving such dispute to alter their treatment of such contract or lease.

## F.    Collective Bargaining Agreements

There are no collective bargaining agreements to be assumed or rejected.

## G.    Supplements to the Plan

Prior to confirmation the Debtor may file amendments and/or supplements to this Plan which shall be incorporated by reference into this Plan or such amended Plan as the Debtor may file and shall be binding on all creditors and interested parties.


## IV.    DESCRIPTION OF DEBTOR AND CAUSES OF BANKRUPTCY

## A.    The Debtor

The Debtor operates a wholesale trade company in Alpena, Michigan. Debtor sells a wide variety of supplies to its customers; such as, but not limited to toilet paper, paper towels, bolts, tools, and salt. Debtor has an extensive inventory and offers hundreds of different products to its customers. Debtor services businesses all throughout Northern Michigan and some parts of the Upper Peninsula. Kenneth Tessmer opened the business in 1989. The business was able to operate profitably, even realizing profits of over $300,000.00 per year at times. Its profitability continued until approximately 2005, when the economy started to decline. Debtor started to experience a decline in sales over the subsequent months and years. Even more problematic, Kenneth Tessmer

started to experience some health problems which ultimately culminated into Mr. Tessmer suffering from a heart attack. Because he is an essential part of the business, this affected the business' day to day operations. As things became more difficult, the Debtor used credit and loaned money from Mr. Tessmer (Debtor's sole shareholder) to pay the day-to-day bills in the hopes that the economy would turn around.

When the recession became worse in 2007, sales spiraled downward. The Debtor was not able make its secured payments nor pay its tax obligations and thus, this Chapter 11 was filed. The Debtor operates out of real property located in Alpena, Michigan and owned by United States Industrial, Inc.; Debtor executed a Promissory Note and Security Agreement in favor of Target Alpena in conjunction with United States Industrial, Inc. executing a Guaranty Agreement and Mortgage for said real property. The Debtor's primary lender is Target Alpena which holds a lien on all the property and assets of the corporation, including Debtor's inventory and any sale proceeds from the sale of said inventory. The State of Michigan, Department of Treasury and the Internal Revenue Service also hold liens. Debtor has not executed any guaranty agreements.

Ken Tessmer is the sole shareholder and his daughter, Christine Baker, manages the day-to-day operations of the corporation. Ken Tessmer is also involved in the management of the corporation but not on a day-to-day basis; instead Mr. Tessmer hands all product deliveries, and thus out of the office tending to customers. The downturn in the Michigan economy, specifically in Alpena, caused a significant downturn in business at the Debtor's location. As local businesses struggled to stay afloat, they looked for ways to downsize and eliminate costs; thus, Debtor's business was affected because business stopped contacting Debtor for supplies and instead searched for ways acquire the needed products on their own. However, Debtor was left holding an

extensive and expensive inventory, and some very specialized parts. The increase in fuel costs over the last 5 years has also compounded Debtor's problems.

Finally, Ken Tessmer, was in the processes of selling Debtor's business when the potential buyer abruptly rescinded the contract, but not before taking Debtor's customer list and converted many of said customers to his own for his own business. Many of Debtor's customers stopped calling Debtor because they were under the assumption that the potential buyer was now Debtor; by the time said customers learned different the damage was already done because the potential buyer was already servicing the customer and provided products at lower prices.

Debtor's business continued to get worse through the date of filing. The combination of the decreased sales and the reliance of the Debtor on credit and loans from the sole shareholder to keep afloat, and a looming foreclosure sale resulted in the necessity of this Chapter 11 filing. Debtor filed its voluntary Chapter 11 petition on July 12, 2012 to prevent further reverse action and to give itself and opportunity to reorganize operations and attempt to restructure its debt.

**B. Principals.**

Kenneth Tessmer is the sole shareholder and President of the Company; he is also the President and only director of the Board of Directors. Mr. Tessmer is involved in the management of the corporation, but not on a day-to-day basis; instead Mr. Tessmer hands all product deliveries, and thus out of the office tending to customers. Mr. Tessmer travels to different delivery regions in Northern Michigan each day. For example, Mr. Tessmer may travel to Oscoda, Michigan and the surrounding cities on Monday and delivers sold products directly to the customers. The next day Mr. Tessmer will travel to another location in Northern, Michigan as determined by Christine Baker the office manager. Mr. Tessmer does not receive compensation for his role in the

corporation, position, or status as a shareholder because for several years now the business has not been able to afford to compensate Mr. Tessmer. Further, Mr. Tessmer does not receive any fringe benefits, nor is there a lessor-lessee relationship with Mr. Tessmmer. Mr. Tessmer is passionate to make the Debtor Corporation successful because the Debtor Corporation has been his life's work. Although Mr. Tessmer at one point was interested in selling the business, it is ultimately his desire to pass a successful business to his daughter, Christine Baker. Mr. Tessmer is working without compensation in order to keep the business operating and to become financially successful again. In 2010, Mr. Tessmer reported $41,520.00 of ordinary income as his Shareholder's share of income; however, it was used to pay debts owed to creditors. In 2011, Debtor reported a loss of approximately $5,854.00; therefore, there was not any net profits realized. Mr. Tessmer expects that when the Debtor Corporation files its 2012 federal income taxes, it will not show ordinary income and instead show a loss. To the extent that any profits may be realized, said profits were used to pay debts owed to creditors. Mr. Tessmer is able to go without compensation and use any net income realized, if any, to pay creditors in part, because Mr. Tessmer now receives social security because of his age.

Mr. Tessmer's daughter, Christine Baker is the office manager and manages the day-to-day operations of the Debtor Corporation. For example, Ms. Baker answers the telephone, is responsible for the bookkeeping, billing, taking sales, filling orders, and preparing the delivery van for the following day's trip. Ms. Baker is the secretary for Debtor, but does not hold a position on the Board of Directors. Ms. Baker does not receive an annual salary or any monetary compensation. Ms. Baker does not receive compensation because for several years now the business has not been able to afford to compensate Ms. Baker for her services. Further, Ms. Baker

does not receive any fringe benefits, nor is there a lessor-lessee relationship with Ms. Baker. Because Debtor is owned by her father, and Ms. Baker is aware of how much the Debtor Corporation means to Mr. Tessmer, she is working without compensation in order to keep the business operating and become financially successful again. Ms. Baker is able to do this, in part, because her husband financially supports their family and is supportive of Ms. Baker's efforts to turn the business around. Ms. Baker is unsure the date she was last time she was paid compensation, as it has been several years. Ms. Baker has limited access to corporate records to determine said date because many of the corporate documents were destroyed when a computer crashed that held Debtor's financial information; however, Ms. Baker the last she received compensation was sometime in 2010.

There are no other principles associated with the Debtor Corporation. In fact, Debtor does not have any other employees other than Ms. Baker and Mr. Tessmer. After reorganization, Ms. Baker and Mr. Tessmer will maintain their current roles in the Debtor Corporation.

## C. Principals' Compensation During Plan Period.

It is the Principles, Ms. Baker and Mr. Tessmer, intention to receive no annual salary, monetary compensation, or draw. They determined that this plan of action would be best to ensure the feasibility of this Plan and to assist this Debtor Corporation in becoming viable.

It is Mr. Tessmer's objective to temporarily forego compensation in order to assist the Debtor with compliance to this Plan and its payment terms. If net profits are realized at the end of the year then Mr. Tessmer would possibly take advantage of his Shareholder equity as reported on IRS form K-1 (or potentially a draw) at that time, as long as it is not detrimental to the Plan and as long any such payment to Mr. Tessmer would not leave the Plan short of funds for the following

year.

Ms. Baker's objective is to also temporarily forego compensation in order to assist the Debtor with compliance to this Plan and its payment terms. If net profits are realized at the end of the year then Ms. Baker would possibly start take advantage of such net profits realized by starting to receive compensation at an hourly rate for the following year. Again, as long as it is not detrimental to the Plan and as long any such wages paid to Ms. Baker would not leave the Plan short of funds for the following year or cause the Debtor to struggle making Plan payments. Ms. Baker's rate of compensation would be determined at that time by the net profitably, if any, and Debtor's ability to pay without causing damage to the Plan.

## C. Primary Causes of Bankruptcy

The economic downturn in the United States over the past five years has nowhere been felt worse than in Michigan and particularly, in the Alpena area. The combination of decreased sales and Debtor's reliance on credit put the Debtor in a position where it was unable to fully service its debts to its secured creditor and pay its obligations to the State of Michigan and the Internal Revenue Service. The Debtor filed its voluntary Chapter 11 petition on July 12, 2012 to prevent further adverse actions and to give itself an opportunity to reorganize operations and attempt to restructure its debt.

## V. POST-PETITION EVENTS OF SIGNIFICANCE

The following contains an overview of certain events occurring after the Chapter 11 filing, including the administration of the Chapter 11 case, the stabilization of the Debtor's operations, and the Debtor's restructuring initiatives.

## A. Filing the Chapter 11 Case Petitions

This case was filed as voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 12, 20121. The Debtor is authorized to continue to operate its businesses and manage its properties as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No request for appointment of a Chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

A Stipulation By and Between the Debtor, Target Alpena Development Corporation, and the U.S. Trustee regarding the Entry of Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection was filed on August 1, 2012. An Order for same was entered on August 1, 2012. Subsequently, an Order Granting Stipulation for First Extension of Order Authorizing Use of Cash Collateral and Granting Adequate Protection was entered on November 2, 1012 extending the use of cash collateral and granting adequate protection.

## B. Business Continuation; Litigation Stay

The Debtor's chapter 11 filings immediately gave rise to the Bankruptcy Code's "automatic stay" which, with limited exceptions, enjoined commencement and continuation of all creditor collection efforts, litigation against the Debtor, and enforcement of liens against the Debtor's property. This relief provided the Debtor with "breathing room" to assess and reorganize its businesses.

Ms. Baker has been diligent in increasing her client base and has retained many new large and small accounts. In addition, over the past couple months Ms. Baker has reviewed her product pricing and has made adjustments to Debtor's product prices; with the expectation this will increase Debtor's net income. Ms. Baker has increased the sales price for bolts and has decreased the cost of

goods for paper products. Ms. Baker also reviewed her inventory and started to offer new products that meet her customer's new and emerging needs. Once spring 2013 arrives, and Debtor's client's businesses increase (for example, when state parks open), Debtor anticipates significantly larger product orders due to said new accounts, new products, and new product pricing; which ultimately leads to significantly higher net income that benefits the estate and creditors. Based on Ms. Baker's efforts to increase sales and profits, Debtor believes there will be a successful reorganization.

Since the Petition Date, the Debtor has worked to realign its secured debt. As the Debtor's financial projections will show, it is now in a position to continue successful operations while at the same time repaying its prepetition obligations under the terms proposed in this Plan.

**C.**     **Post-Petition Sales Outside the Ordinary Course of Business**

There have been no significant sales or transfers of property post-petition outside the ordinary course of business.

**D.**     **Post-Petition Financing**

There has not been any post-petition financing.

**E.**     **Litigation**

There has been no litigation in this case initiated by the Debtor.

## VI.     LIQUIDATION ANALYSIS, ASSETS, LIABILITIES AND CLAIMS

**A.**     **Liquidation Analysis**

The Debtor has conducted a preliminary liquidation analysis (the "Liquidation Analysis"). The fair market value of the real property that Debtor operates out is valued at $131,000.00 based on the state equalized value and is owned by US Industrial, Inc., Debtor in companion case, In Re:

U.S. Industrial, Inc., file no.12-22150 and filed on July 13, 2012; therefore, it cannot be considered in this liquidation analysis. The remaining assets, Debtor's inventory, equipment, and machinery, have a fair market value of $99,426.00. The forced sale approach that would be used in Chapter 7 liquidation assumes a six month time period, however, it is unlikely that the property could be liquidated in that time frame. The Liquidation Analysis is attached hereto as Exhibit "B". The Debtor believes that this is a high value and that it is very unlikely this value would be realized.

The Debtor believes that the Plan will produce a greater recovery for allowed claim and interest holders than would be achieved in a liquidation under Chapter 7 of the Bankruptcy Code because of, among other things, (1) the additional administrative claims generated by conversion to Chapter 7 cases; (2) the administrative costs of liquidation and associated delays in connection with Chapter 7 liquidations; and (3) the negative impact on the market for the Debtor's assets resulting from attempts to sell the assets in a short time frame, each of which likely would diminish the overall value of the Debtor's assets available for distributions.

The Liquidation Analysis compares the proceeds to be realized if the Debtor was to be liquidated in hypothetical cases under Chapter 7 of the Bankruptcy Code with distributions to allowed claim and interest holders under the Plan. The analyses are based on the value of the Debtor's assets and liabilities as of a certain date and incorporate various estimates and assumptions, including a hypothetical conversion to Chapter 7 liquidations as of a certain date. Further, each analysis is subject to the possibility of material change, including changes in economic and business conditions and legal rulings. The Debtor's actual liquidation value could, therefore, differ materially from the Liquidation Analysis estimates, especially if the Court must become involved in determining disputed values for the Debtor's properties.

**B. Potential Claims and Causes of Action Including Preference and Fraudulent Conveyance Actions**

The Debtor has not conducted a preference analysis, fraudulent conveyance analysis, or analysis with respect to other avoidance actions or claims objections. Any creditor who received payment from the Debtor within 90 days prior to the Petition Date may be named as a defendant in a preference action. The Debtor specifically reserves all rights to pursue any and all claims, causes of actions, avoidance actions, objections to claims, fraudulent conveyance actions or any other type of action.

**C. Procedures for Resolving Disputed Claims**

**1. Claims Administration**

The Debtor, shall be responsible for and shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all claims against, and interests in, the Debtor and making distributions (if any) with respect to all claims and interests.

**2. Filing of Objections**

Unless otherwise provided in the Plan or extended by the Bankruptcy Court, any objections to claims and/or interests shall be served and filed on or before the date which is ninety (90) days after the Confirmation Date (the "Claims Objection Deadline"). Notwithstanding any authority to the contrary, an objection to a claim or interest shall be deemed properly served on the holder of the claim or interest if the Debtor or Reorganized Debtor, as the case may be, effect service in any of the following manners: (i) in accordance with Bankruptcy Rule 3007, (ii) to the extent counsel for a holder of a claim or interest is unknown, by first-class mail, postage prepaid, on the signatory on the proof of claim or other representative identified on the proof of claim or any attachment thereto (or at the

last known addresses of such holders of claims if no proof of claim is filed or if the Debtor has been notified in writing of a change of address), or (iii) by first-class mail, postage prepaid, on any counsel that has appeared on behalf of the holder of the claim or interest in the Chapter 11 cases and has not withdrawn such appearance.

3.    Claim Dispute Resolution Procedures

Resolution of disputes regarding claims shall be subject to the following parameters:

- If the settlement amount for a disputed claim is less than $5,000.00, the Reorganized Debtor shall be authorized to settle such claim or interest without the need for further Bankruptcy Court approval or further notice.

- If the settlement amount for a disputed claim is greater than or equal to $5,000.00, the Reorganized Debtor, shall file a proposed settlement stipulation with the Bankruptcy Court with notice and hearing consistent with the Local Rules and the Bankruptcy Rules.

- Settlement of any pre-petition controversies in these categories resulting in monetary claims against the Debtor shall be resolved solely by determination and allowance of a claim, subject to the requirements of the Plan.

- Settlement of any postpetition controversies in these categories resulting in monetary claims against the Debtor or Reorganized Debtor may be resolved, where applicable, by the Reorganized Debtor, by an allowance of an administrative claim related to such settlement.

- The Reorganized Debtor is authorized to allow claims against the Debtor and its Estate, where the allowance of such Claims otherwise meets the requirements of the Plan.

- The Reorganized Debtor is authorized to allow claims with a specific priority and security status, where the allowance of such Claims otherwise meets the requirements of the Plan and

does not in any way affect, whether as a prior or subordinated lien, the lien of any other party. For purposes of clarity and without limitation, the granting or recognition of a subordinated lien shall not be allowed, absent a Bankruptcy Court order, without the consent of all other lien holders with respect to the affected collateral.

4.      Determination of Claims

Any claim (or any revision, modification, or amendment thereof) determined and liquidated pursuant to (i) the procedures listed in this Plan, or (if) a final order of the Bankruptcy Court shall be deemed an allowed claim in such liquidated amount and satisfied in accordance with the Plan, unless otherwise ordered by the Bankruptcy Court.

5.      Insider Settlements

Notwithstanding anything to the contrary in the Plan, any settlement that involves an insider, set forth at Section 101(31) of the Bankruptcy Code, shall be effected only in accordance with Bankruptcy Rule 9019(a).

6.      Ordinary Course of Business Exception

The applicable Plan provisions shall in no manner affect, impair, impede, or otherwise alter the right of the Debtor or Reorganized Debtor to resolve any controversy arising in the ordinary course of the Debtor's or Reorganized Debtor's business or under any other order of the Bankruptcy Court.

7.      Claims Bar Date

Except as provided in the Plan or otherwise agreed, any and all claims for which a proof of claim was filed after the applicable bar date shall be disallowed, expunged and forever barred as of the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such claims may not receive any distributions on account of such claims, unless on or

before the Confirmation Date such late claims have been deemed timely filed by a final order.

8.     <u>Amendments to Claims</u>

On or after the Confirmation Date, except as provided herein, a claim may not be filed or amended without the prior authorization of the Bankruptcy Court, or Reorganized Debtor. To the extent any such claim is filed without such authorization, such claim shall be deemed to be a disallowed claim and expunged without any further notice to or action, order, or approval of the Bankruptcy Court or any other person.

## VII.     EXECUTION AND IMPLEMENTATION OF PLAN

**A.     Financial Projections**

Debtor's financial projections as prepared by their accountant, VanMassenhove, Kearly, Taphouse & Faulman, P.C., certified public accounts, are attached hereto as Exhibit "C". These projections show that the Debtor's cash flow availability on a quarterly basis is sufficient to make the payments provided for under this Plan. The Schedules of Projected Financial Information prepared by VanMassenhove, Kearly, Taphouse & Faulman, P.C. ("CPA's Report) is attached as Exhibit "D." The Debtor's year-end financial statements for years 2010, 2011, 2012 and through March of 2013 financials are also attached as Exhibit "E".

**B.     Continuation of Business**

The Debtor will continue operation of its businesses in their current location. The Debtor believes that the Debtor's business assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. Consistent with the Liquidation Analysis described in this Plan and other analyses prepared by the Debtor and its professionals, the value of the Debtor's estate would be considerably greater if the Debtor continues to operate as a going

concern instead of liquidating.

## C. Tax Ramifications

The Plan does not contemplate the sale of assets so there should be no capital gains issues. Further, while there will be a significant discharge of indebtedness it will not result in income to the Debtor because of the provisions of 26 U.S.C. § 108(a)(1)(A) which provides a safe harbor for Title 11 discharges of indebtedness.

## D. Claim Discharge and Interest Termination

Pursuant to Section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan or in the Confirmation Order, confirmation of the Plan and the distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Confirmation Date, of all claims and causes of action, whether known or unknown, against, liabilities of, obligations of, rights against, and interests in the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such claims, rights, and interests, including, but not limited to, claims and interests that arose before the Confirmation Date, any liability (including withdrawal liability) to the extent such claims relate to services performed by employees of the Debtor prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Confirmation Date, all debts of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim based upon such claim, debt, right, or interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (b) a claim or interest based upon such claim, debt, right, or interest is allowed under Section 502 of the

Bankruptcy Code, or (c) the holder of such a claim, right, or interest accepted the Plan, the Confirmation Order shall be a judicial determination of the discharge of all claims against and interests in the Debtor, subject to the occurrence of the Confirmation Date.

Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, all persons that have held, currently hold, or may hold claims or interests that have been discharged or terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against any of the reorganized Debtor or its property on account of any such discharged claims, debts, liabilities, or terminated interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due to the Debtor; and (v) commencing or continuing any action in any manner, in any place that does not comply, or is consistent, with the provisions of the Plan.

**E.      Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Confirmation Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, including without limitation, jurisdiction to:

- Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any claim or interest, including the resolution of any request for payment of any administrative claim and the resolution of any and all objections to the secured or

unsecured status, priority, amount, or allowance of claims or interests;

- Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to professionals authorized pursuant to the Bankruptcy Code or the Plan;

- Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any cure or claims arising therefrom, including cure or claims pursuant to Section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any executory contract or unexpired lease that is assumed; (c) the Reorganized Debtor amending, modifying, or supplementing, after the Confirmation Date, the list of executory contracts or unexpired leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

- Ensure that distributions to holders of allowed claims and interests are accomplished pursuant to the provisions of the Plan;

- Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving any Debtor that may be pending on the Confirmation Date;

- Adjudicate, decide, or resolve any and all matters related to any causes of action held by the Debtor as of the Confirmation Date;

- Adjudicate, decide, or resolve any and all matters related to Section 1141 of the Bankruptcy Code;

- Enter and implement such orders as may be necessary or appropriate to execute, implement, or

consummate the provisions of the Plan and Confirmation Order and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

- Enter and enforce any order for the sale of property pursuant to Sections 363,1123, or 1146(a) of the Bankruptcy Code;

- Resolve any cases, controversies, suits, disputes, or causes of action that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any person's obligations incurred in connection with the Plan, including but not limited to the obligation of any party to subordinate their debt under the terms of this Plan.

- Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any person with consummation or enforcement of the Plan;

- Resolve any cases, controversies, suits, disputes, or causes of action with respect to the releases, injunctions, and other provisions contained in the Plan, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

- Resolve any and all cases, controversies, suits, disputes, or causes of action with respect to the repayment or return of distributions and the recovery of additional amounts owed by a holder of a claim for amounts not timely repaid;

- Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

- Adjudicate any and all disputes arising from or relating to payments or distributions under the Plan;

- Consider any and all modifications of the Plan, to cure any defect or omission, or to reconcile

any inconsistency in any final order, including the Confirmation Order;

- Hear and determine requests for the payment or distribution on account of claims entitled to priority pursuant to Section 507 of the Bankruptcy Code;

- Hear and determine any and all disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

- Hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code with any tax incurred or alleged to be incurred by any Debtor or Reorganized Debtor a result of consummation of the Plan being considered to be incurred or alleged to be incurred during the administration of these Chapter 11 Cases for purposes of Section 505(b) of the Bankruptcy Code;

- Hear and determine any and all disputes involving the existence, nature, or scope of the Debtor's discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Confirmation Date;

- Determine any other matters that may arise in connection with or relate to the Plan, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan;

- Enforce any orders previously entered by the Bankruptcy Court;

- Hear any and all other matters not inconsistent with the Bankruptcy Code; and

- Enter an order or Final Decree concluding or closing the Chapter 11 Cases.

## F.  Miscellaneous Provisions

### 1.  Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Confirmation Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtor, Reorganized Debtor, and any and all holders of claims or interests (irrespective of whether any such holders of claims or interests did not vote to accept or reject the Plan, voted to accept or reject the Plan, or are deemed to accept or reject the Plan), all persons that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each person acquiring property under the Plan, and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtor.

### 2.  Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Michigan, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding,

alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtor's consent; and (3) nonseverable and mutually dependent.

## VIII. STATUTORY REQUIREMENTS FOR PLAN CONFIRMATION

The following is a brief summary of the plan confirmation process in a proceeding under Chapter 11 of the Bankruptcy Code. Claim and interest holders are encouraged to review the Bankruptcy Code's relevant provisions and to consult their own attorneys.

### A. The Confirmation Hearing

Bankruptcy Code Section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on plan confirmation. Under Bankruptcy Code Section 1128(b), any party in interest may object to plan confirmation. The Court in this case will enter an order setting the confirmation hearing date. The Bankruptcy Court may adjourn the confirmation hearing from time to time without further notice except by announcing the adjournment date at the confirmation hearing or at any subsequent adjourned confirmation hearing.

### B. Confirmation Standards

To confirm the Plan, the Bankruptcy Court must find that, among other things, the requirements of Bankruptcy Code Section 1129 are satisfied. In summary, these requirements include the following:

1. The Plan complies with all applicable Bankruptcy Code provisions.

2. The Debtor has complied with the applicable Bankruptcy Code provisions.

3. The Plan has been proposed in good faith and not by any means forbidden by law.

4. Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the cases, has been disclosed to the Bankruptcy Court, and any such payment made before Plan Confirmation is reasonable, or if such payment is to be fixed after Confirmation, such payment is subject to Bankruptcy Court approval as reasonable.

5. With respect to each class of impaired claims or interests, either each claim or interest holder in such class has accepted the Plan or will receive or retain under the Plan on account of such claim or interest, property of a value, as of the Confirmation Date, not less than the amount such holder would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code.

6. Each class of claims or interests entitled to vote on the Plan either has accepted the Plan or is not impaired under the Plan, or the Plan can be confirmed without the approval of each voting class under Bankruptcy Code Section 1129(b).

7. Except to the extent a particular claim holder agrees to different treatment, allowed administrative claims and other allowed priority claims will be fully paid on, or as soon as reasonably practical after, the Confirmation Date.

8. At least one class of impaired claims or interests has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim or interest in such class.

9. Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless the

liquidation or reorganization is proposed in the Plan.

10. All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Confirmation Date.

11. The Plan addresses payment of retiree benefits in accordance with Bankruptcy Code Section 1114.

The Debtor believes that the Plan satisfies the requirements of Bankruptcy Code Section 1129, including, without limitation, that (i) the Plan satisfies or will satisfy all of the Bankruptcy Code's statutory requirements; (ii) the Debtor has complied or will have complied with all of the Bankruptcy Code's requirements; and (iii) the Debtor proposed the Plan in good faith.

## C.      Best Interests of Creditors Test

Before it can confirm the Plan, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each class, that each claim or interest holder in such class either: (a) has accepted the Plan; or (b) will receive or retain under the Plan property of a value, as of the Confirmation Date, not less than the amount that such Person would receive or retain if the Debtor liquidated under Chapter 7 of the Bankruptcy Code.

In Chapter 7 liquidation cases, unsecured creditors and interest holders are generally paid from available assets in the following order, with no junior class receiving any payments until all amounts due to senior classes have been fully paid or any such payment is provided for:

- Secured creditors (to the extent of their collateral's value);

- Administrative and other priority creditors;

- Unsecured creditors;

- Debt expressly subordinated by its terms or by Bankruptcy Court order; and

- Equity interest holders.

As described in more detail in the Liquidation Analysis, the Debtor believes that the value of any distributions in a Chapter 7 case would be less than the value of Plan distributions because, among other reasons, distributions in a Chapter 7 case may not occur for a longer period of time, reducing the distributions' present value. In this regard, it is possible that Chapter 7 distributions could be delayed for a period for a trustee and its professionals to become knowledgeable about the Chapter 11 Cases and the claims against the Debtor. In addition, Chapter 7 distributions are likely to be significantly discounted because of the sale's distressed nature, and because the Chapter 7 trustee's and professionals' fees and expenses would likely exceed those of the Debtor's professionals (further reducing cash available for distribution).

## D.    Financial Feasibility

Before it can confirm the Plan, the Bankruptcy Court must also find that confirmation is not likely to be followed by the Reorganized Debtor's liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. For purposes of showing that the Plan meets this feasibility standard, the Debtor has analyzed the Reorganized Debtor's ability to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses.

Projections indicate that the Reorganized Debtor should have sufficient cash flow to pay and service their debt obligations and to fund their operations. Accordingly, the Debtor believes that the Plan complies with Bankruptcy Code section 1129(a)(1 l)'s financial feasibility standard.

## E.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to plan confirmation that, except as described

in the following Section, each class of impaired claims or equity interests accept the plan. A class not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of that claim or interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the claim or interest holder receives cash equal to the allowed amount of its claim or, with respect to any interest, any fixed liquidation preference to which the interest holder is entitled or any fixed price at which the Debtor may redeem the security.

### F.      Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows a Bankruptcy Court to confirm a plan, even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Bankruptcy Code section 1129(b) states that, notwithstanding an impaired class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests impaired that is impaired under, and has not accepted, the plan.

Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including the effect of applicable subordination agreements between parties. Accordingly, a plan could treat two unsecured-creditor classes differently without unfairly discriminating against either class.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims

includes the requirements that: (a) the secured claim holders retain the liens securing their claims for the claims' allowed amount, whether the debtor retains the applicable encumbered property or transfers it to another entity under the plan; and (b) each secured claim holder in the class receives deferred cash payments totaling at least the claims' allowed amount with a present value, as of the plan's effective date, at least equivalent to the value of the secured claimant's interest in the applicable encumbered property.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims requires that either: (a) the plan provides that each claim holder in the class receive or retain property valued, as of the plan's effective date of the plan, equal to the claim's allowed amount; or (b) any claim or interest holder junior to the claims of the class will not receive or retain under the plan any property for the junior claim or equity interest

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests requires that either: (a) the plan provides that each interest holder in the class receives or retains under the plan property of a value, as of the plan's effective date, equal to the greater of (T) the allowed amount of any fixed liquidation preference to which the interest holder is entitled, (if) any fixed redemption price to which the interest Holder is entitled, or (iii) the interest's value; or (b) if the class does not receive such an amount as required under (a), no class of equity-interests junior to the non-accepting class receives a distribution under the plan.

The Plan provides that if any impaired class rejects the Plan, the Debtor reserves the right to seek to Plan confirmation under Bankruptcy Code Section 1129(b)'s "cram down" provisions. If any impaired class rejects the Plan or is deemed to have rejected the Plan, the Debtor will request Plan confirmation under Bankruptcy Code section 1129(b). The Debtor reserves the right to alter,

amend, modify, revoke or withdraw the Plan or any Plan exhibit or supplement, including for the purpose of satisfying Bankruptcy Code Section 1129(b)'s requirements, if necessary.

## IX. VOTING INSTRUCTIONS

### A. Confirmation Generally

The Bankruptcy Court may confirm a plan only if it determines that the plan complies with the requirements of chapter 11 of the Bankruptcy Code. One of these requirements is that the Bankruptcy Court find, among other things, that the plan has been accepted by the requisite votes of all classes of impaired claims and impaired interests unless approval will be sought under Bankruptcy Code Section 1129(b) despite the non-acceptance by one or more such classes.

### B. Voting procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interest, that are impaired under the plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the plan.

Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of

proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan and disclosure statement, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the debtor's attorney by the deadline previously established by the court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the debtor's attorney.

## C.        **Establishing Claim Amounts**

In tabulating votes, the following hierarchy will be used to determine the claim amount associated with each creditor's vote:

1) The claim's allowed amount, if the claim has been allowed pursuant to Court order;

2) The claim amount settled and/or agreed upon by the Debtor, as reflected in a court pleading, stipulation, term sheet, agreement, or other document filed with the Bankruptcy Court, in an order entered by the Bankruptcy Court, or in a document executed by the Debtor pursuant to authority granted by the Bankruptcy Court, regardless of whether a proof of claim has been filed;

3) The claim amount contained on a proof of claim that has been timely filed by the relevant bar date (or deemed timely filed by the Bankruptcy Court under applicable law); provided, however, that ballots cast by holders whose claims are not listed on the Debtor's schedules, but who timely filed proofs of claim in unliquidated or unknown amounts that are not the subject of an objection filed before the voting deadline, will count for satisfying the numerosity requirement of Section 1126(c) of the Bankruptcy Code, and the unliquidated or unknown portion of the Claims will count in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of Section 1126(c) of the Bankruptcy Code;

4) The claim amount listed in the Debtor's schedules, provided that such claim is not scheduled as contingent, disputed, and/or unliquidated and has not been paid.

5) In the absence of any of the foregoing, at zero.

The claim amount established pursuant to the foregoing will control for voting purposes only, and will not be determinative of the allowed amount of any claim.

**D.    Ballot Tabulation**

The following voting procedures and standard assumptions shall be used in tabulating ballots:

1) Unless a ballot being furnished is timely submitted on or prior to the voting deadline, the Debtor may reject such ballot as invalid and, therefore, decline to count it in connection with confirmation;

2) The method of delivery of ballots to be sent to Debtor's counsel is at the election and risk of each holder, and except as otherwise provided, a ballot will be deemed delivered only when Debtor's counsel actually receives the original executed ballot;

3) An original executed ballot is required to be submitted by the person submitting such ballot. Delivery of a ballot to the Debtor's Counsel by facsimile, e-mail, or any other electronic means will not be valid;

4) The Debtor expressly reserves the right to amend from time to time the terms of the Plan in accordance with the terms thereof (subject to compliance with the requirements of Section 1127 of the Bankruptcy Code and the terms of the Plan regarding modification);

5) If multiple ballots are received from the same claim holder with respect to the same claim prior to the voting deadline, the latest valid ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior received ballot for the same claim;

6) Claim holders must vote all of their claims within a particular class either to accept or to reject the Plan and may not split such votes. Accordingly, a ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple claims within the same class, the Debtor may, in its sole discretion, aggregate the claims of any particular holder within a class for the purpose of counting votes;

7) A person signing a ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity should indicate such capacity when signing and must submit proper evidence to the requesting party to so act on behalf of such holder or beneficial holder;

8) The Debtor, subject to contrary order of the Bankruptcy Court, may waive any defects or irregularities as to any particular ballot at any time, either before or after the voting deadline, and any such waivers will be documented in the voting report;

9) Neither the Debtor nor any other person, will be under any duty to provide notification of defects

or irregularities with respect to delivered ballots other than as provided in the voting report, nor will any of them incur any liability for failure to provide such notification;

10) Unless waived or as ordered by the Bankruptcy Court, any defects or irregularities in connection with deliveries of ballots must be cured prior to the voting deadline or such ballots will not be counted;

11) If a claim is listed in the schedules as being a non-priority claim (or is not listed in the schedules) and a proof of claim is filed as a priority claim (in whole or in part), such claim will be temporarily allowed for voting purposes as a non-priority claim in an amount that such claim would have been so allowed had such proof of claim been filed as a non-priority claim;

12) If a claim is listed in the schedules as being an unsecured claim (or is not listed in the schedules) and a proof of claim is filed as a secured claim (in whole or in part), such claim will be temporarily allowed for voting purposes as an unsecured claim in an amount that such claim would have been so allowed had such proof of claim been filed as an unsecured claim.

13) Subject to any contrary order of the Bankruptcy Court, the Debtor reserves the right to reject any and all ballots not in proper form, the acceptance of which, in the opinion of the Debtor, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; provided, however, that any such rejections will be documented in the voting report;

14) If a claim has been estimated or otherwise allowed for voting purposes only by an order of the Bankruptcy Court, such claim shall be temporarily allowed in the amount so estimated or allowed by the Bankruptcy Court for voting purposes only and not for purposes of allowance or distribution;

15) The following ballots shall not be counted in determining the acceptance or rejection of the Plan:

(i) any ballot that is illegible or contains insufficient information to permit the identification of the claim holder; (ii) any ballot cast by a person that does not hold a claim in a class that is entitled to vote on the Plan; (iii) any ballot cast for a claim listed on the Debtor's schedules as contingent, unliquidated, and/or disputed for which no proof of claim was timely filed; (iv) any unsigned ballot or one lacking an original signature; and (v) any ballot not marked to accept or reject the Plan, or marked both to accept and reject the Plan.

E.    **Acceptance**

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

F.    **Confirmation**

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these:

1.    Each class of impaired creditors and interest must accept the plan, as described in paragraph VI.B., above.

2.    Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the

Bankruptcy Code.

## G.     Effect of confirmation

If the plan is confirmed by the Court:

1. Its terms are binding on the debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the plan.

2. Except as provided in the plan:

    (a) In the case of a corporation that is reorganizing and continuing business:

        (1)     All claims and interests will be discharged.

        (2)     Creditors and shareholders will be prohibited from asserting their claims against or interest in the debtor or its assets.

## H.     Modification

The debtor reserves the right to modify or withdraw the plan at any time before confirmation.

## I.     Effect of confirmation

If the plan is confirmed by the Court:

1.     Its terms are binding on the debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the plan.

2.     Except as provided in the plan:

    (a)     In the case of a corporation that is reorganizing and continuing business:

        (1)     All claims and interests will be discharged.

        (2)     Creditors and shareholders will be prohibited from asserting their claims against or interest in the debtor or its assets.

    (b)     In the case of a corporation that is liquidating and not continuing its business:

        (1)     Claims and interests will not be discharged.

(2)     Creditors and shareholders will not be prohibited from asserting their claims against or interests in the debtor or its assets.

(c)     In the case of an individual or husband and wife:

(1)     Claims will be discharged, except as provided in 11 U.S.C. §§ 523 and 727(a).

(2)     Creditors will be prohibited from asserting their claims except as to those debts which are not discharged or dischargeable under 11 U.S.C. §§ 523 and 727(a).

See Part II-A of this Disclosure Statement to determine which of the above paragraphs applies in this case.

## J.     Discharge (applicable to individual debtors only)

The Debtors herein will not receive a discharge until all payments have been made under the Plan in accordance with 11 U.S.C. § 1141(d)(5).   It is the usual practice of the court to close Chapter 11 cases after confirmation, then the debtor files a motion to reopen the case for entry of discharge upon completion of plan payments.

Dated: May 8, 2013

/s/Cristie A. VanMassenhove
Cristie A. VanMassenhove
Attorney for Debtor
421 S. Ripley Boulevard
Alpena, MI 49707
(989) 356-2128
cristievanmassenhove@gmail.com

Dated: May 8, 2013

/s/Kenneth Tessmer
Kenneth Tessemer
President, P & S Distributors, Inc.

# EXHIBIT A

<u>Class – General Unsecured Claims.</u>

| | |
|---|---|
| Great North Foods | $2,351.91 |
| Isackson, Wallace, & Pfeifer, P.C. | $1,700.00 |
| Rowley Brothers | $8,401.98 |
| Boldrey, Senchuk, Rouleau & Williams | $9,480.26 |
| Absorbents Midwest | $3,101.25 |
| PCI Products Company | $1,255.03 |
| Total: | $26,290.43 |

# EXHIBIT B

## LIQUIDATION ANALYSIS

I.  Valuation of Asset and Amount(s) Secured Claims in Relation Thereto (as of May 8, 2013)

| Describe the Assets and Collateral | Creditor Holding Lien | Market Value and Forced Sale Value | Amount of Secured Claim | Equity | Comments |
|---|---|---|---|---|---|
| Machinery & Equipment | Target | $2,194.00 | $27,424.64 | ($25,231.00) | Located at 2612 US 23 S Alpena, MI 49707 |
| Inventory | Target | $93,588.00 | $27,424.64 | $66,163.36 | Located at 2612 US 23 S Alpena, MI 49707 |
| Cash | Target | $5.00 | $27,424.64 | ($27,420.00) | Located at HPC Credit Union |
| Goods, Furnishings, Office Equipment & Supplies | Target | $3,639.00 | $27,424.64 | ($23,786.00) | Located at 2612 US 23 S Alpena, MI 49707 |

Total Equity if fair market value used = $99,426.00

Total Equity if forced sale value used = $99,426.00

II.  Proceeds of Assets (before deducting amount of secured claims)

|  | Estimated Liquidation Amount(s) |
|---|---|
| Machinery & Equipment | $2,194.00 |
| Inventory | $93,588.00 |
| Cash | $5.00 |
| Goods, Furnishings, Office Equipment & Supplies | $3,639.00 |
| Total: | $99,426.00 |

III. Claims

    (a) Secured Claims

| | Estimated Liquidation Amount(s) |
|---|---|
| Target Alpena Development Corp. | $27,424.64 |

    (b) Administrative Expenses

| | Estimated Liquidation Amount(s) |
|---|---|
| United States Trustee Fees | $13,000.00 |
| Debtor's Attorney | $14,643.00 |
| Debtor's Financial Advisors and Accountants | $1,800.00 |
| Total: | $29,443.00 |

    (c) Pre-Petition Unsecured Priority Claims
    Priority Tax Claims Consisting of:

| | Estimated Liquidation Amount(s) |
|---|---|
| Internal Revenue Service (IRS) | $33,313.33 |
| State of Michigan, Department of Treasury | $11,683.31 |
| State of Michigan, Department of Treasury | $2,584.63 |
| Total: | $47,581.27 |

    (d) Total Secured, Administrative and Pre-Petition Priority Claims: $104,448.91

IV. Distribution of Proceeds of Assets in the Event of Liquidation

    (a) Gross Proceeds Available From Liquidation of Assets:    $99,426.00

    (b) Less Total of:

| | Estimated Liquidation Amount(s) |
|---|---|
| Secured Claims | $27,424.64 |
| Administrative Expenses | $29,443.00 |
| Pre-Petition Unsecured & Priority Claims | $47,581.27 |
| Total: | $104,448.91 |

|       |       |
|-------|-------|
| (c) Net Proceeds | ($5,022) |
| (d)  Percentage (%) available to Pre-petition Unsecured Creditors | 0% |
| (e) Proceeds Available for Equity Interests | 0% |

Based on liquidation value of the assets, there would not be funds available for unsecured creditors upon liquidation of all assets in a Chapter 7 proceeding; therefore, Class 5 would result in a substantially smaller distribution than the proposed treatment set forth in the Plan. Further, for the purposes of this liquidation analysis, it is appropriate to use for liquidation value; however, it should be noted that, and based on the fair market value, there would not be funds available for payment to unsecured creditors.

# EXHIBIT C

Projected Cash Flow Summary
P&S Distributors, Inc.
For the Five Year Period – 2013 through 2017

Annual Sales Increase

| Description | Year 1 FYE 12/31/2013 | Year 2 FYE 12/31/2014 | Year 3 FYE 12/31/2015 | Year 4 FYE 12/31/2016 | Year 5 FYE 12/31/2017 | Total |
|---|---|---|---|---|---|---|
| Sales | $244,500.00 | $250,600.00 | $256,800.00 | $263,200.00 | $269,800.00 | $1,284,900.00 |
| Cost of Goods Sold | $174,100.00 | $178,400.00 | $182,850.00 | $187,400.00 | $192,100.00 | $ 914,850.00 |
| Gross Margin | $ 70,400.00 | $ 72,200.00 | $ 73,950.00 | $ 75,800.00 | $ 77,700.00 | $ 370,050.00 |
| *Operating Expenses* | | | | | | |
| Sales Tax | $ 1,100.00 | $ 1,130.00 | $ 1,160.00 | $ 1,190.00 | $ 1,215.00 | $ 5,795.00 |
| Property Tax | $ 2,900.00 | $ 2,900.00 | $ 2,900.00 | $ 2,900.00 | $ 2,900.00 | $ 14,500.00 |
| Rent & Lease Expense | $ 4,059.00 | $ 4,059.00 | $ 4,059.00 | $ 4,059.00 | $ 4,059.00 | $ 20,295.00 |
| Insurance-Auto | $ 4,200.00 | $ 4,310.00 | $ 4,420.00 | $ 4,530.00 | $ 4,650.00 | $ 22,110.00 |
| Auto & Truck | $ 13,990.00 | $ 14,340.00 | $ 14,700.00 | $ 15,070.00 | $ 15,450.00 | $ 73,550.00 |
| Utilities | $ 12,760.00 | $ 13,080.00 | $ 13,410.00 | $ 13,740.00 | $ 14,080.00 | $ 67,070.00 |
| Bank Service Fees | $ 3,760.00 | $ 3,860.00 | $ 3,950.00 | $ 4,050.00 | $ 4,155.00 | $ 19,775.00 |
| Travel & Entertainment | $ 150.00 | $ 170.00 | $ 190.00 | $ 210.00 | $ 230.00 | $ 950.00 |
| Repairs & Maintenance | $ 500.00 | $ 700.00 | $ 900.00 | $ 1,100.00 | $ 1,300.00 | $ 4,500.00 |
| Advertising | $ 300.00 | $ 400.00 | $ 500.00 | $ 600.00 | $ 700.00 | $ 2,500.00 |
| Supplies & Office | $ 500.00 | $ 600.00 | $ 615.00 | $ 630.00 | $ 650.00 | $ 3,085.00 |
| Professional Fees | $ 400.00 | $ 500.00 | $ 600.00 | $ 700.00 | $ 800.00 | $ 3,000.00 |
| Bankruptcy Fee | $ 2,600.00 | $ 2,600.00 | $ 2,600.00 | $ 2,600.00 | $ 2,600.00 | $ 13,000.00 |
| Total Operating Expense | $ 47,309.00 | $ 48,649.00 | $ 50,004.00 | $ 51,379.00 | $ 52,789.00 | $ 250,130.00 |
| Net Cash flow | $ 23,091.00 | $ 23,551.00 | $ 23,946.00 | $ 24,421.00 | $ 24,911.00 | $ 119,920.00 |

See the summary of significant projection assumptions and accountants' report.

Projected Cash Flow Summary
P&S Distributors, Inc.
For the Year Ending 2013

| Description | 1Q 2013 | 2Q 2013 | 3Q 2013 | 4Q 2013 | Year 1 FYE 12/31/2013 |
|---|---|---|---|---|---|
| Sale | $ 65,037.00 | $ 62,348.00 | $ 63,081.00 | $ 54,034.00 | $ 244,500.00 |
| Cost of Goods Sold | $ 46,310.00 | $ 44,396.00 | $ 44,918.00 | $ 38,476.00 | $ 174,100.00 |
| Gross Margin | $ 18,727.00 | $ 17,952.00 | $ 18,163.00 | $ 15,558.00 | $ 70,400.00 |
| *Operating Expenses* Sales Tax | $ 293.00 | $ 280.00 | $ 284.00 | $ 243.00 | $ 1,100.00 |
| Property Tax | $ 0.00 | $ 0.00 | $ 740.00 | $ 2,160.00 | $ 2,900.00 |
| Rent & Lease Expense | $ 1,014.00 | $ 1,015.00 | $ 1,015.00 | $ 1,015.00 | $ 4,059.00 |
| Insurance-Auto | $ 1,050.00 | $ 1,050.00 | $ 1,050.00 | $ 1,050.00 | $ 4,200.00 |
| Auto & Truck Expense | $ 3,721.00 | $ 3,567.00 | $ 3,609.00 | $ 3,093.00 | $ 13,490.00 |
| Utilities | $ 3,190.00 | $ 3,190.00 | $ 3,190.00 | $ 3,190.00 | $ 12,760.00 |
| Bank Service Fees | $ 1,000.00 | $ 959.00 | $ 970.00 | $ 881.00 | $ 3,760.00 |
| Travel and Entertainment | $ 38.00 | $ 38.00 | $ 37.00 | $ 37.00 | $ 150.00 |
| Repairs & Maintenance | $ 125.00 | $ 125.00 | $ 125.00 | $ 125.00 | $ 500.00 |
| Advertising | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 300.00 |
| Supplies & Office | $ 148.00 | $ 147.00 | $ 148.00 | $ 147.00 | $ 590.00 |
| Professional Fees | $ 0.00 | $ 200.00 | $ 200.00 | $ 0.00 | $ 400.00 |
| Bankruptcy Fee | $ 650.00 | $ 650.00 | $ 650.00 | $ 650.00 | $ 2,600.00 |
| Total Operating Expense | $ 11,304.00 | $ 11,296.00 | $ 12,093.00 | $ 12,616.00 | $ 47,309.00 |
| Net Cash Flow | $ 7,423.00 | $ 6,656.00 | $ 6,070.00 | $ 2,942.00 | $ 23,091.00 |

See the summary of significant projection assumptions and accountants' report.

Projected Cash Flow Summary
P&S Distributors, Inc.
For the Year Ending 2014

| Description | 1Q 2014 | 2Q 2014 | 3Q 2014 | 4Q 2014 | Year 2 FYE 12/31/2014 |
|---|---|---|---|---|---|
| Sale | $ 65,660.00 | $ 63,903.00 | $ 64,655.00 | $ 55,382.00 | $ 250,600.00 |
| Cost of Goods Sold | $ 47,454.00 | $ 45,492.00 | $ 46,027.00 | $ 39,427.00 | $ 178,400.00 |
| Gross Margin | $ 19,206.00 | $ 18,411.00 | $ 18,628.00 | $ 15,955.00 | $ 72,200.00 |
| *Operating Expenses* | | | | | |
| Sales Tax | $ 301.00 | $ 288.00 | $ 292.00 | $ 249.00 | $ 1,130.00 |
| Property Tax | $ 0.00 | $ 0.00 | $ 740.00 | $ 2,160.00 | $ 2,900.00 |
| Rent & Lease Expense | $ 1,014.00 | $ 1,015.00 | $ 1,015.00 | $ 1,015.00 | $ 4,059.00 |
| Insurance-Auto | $ 1,050.00 | $ 1,050.00 | $ 1,105.00 | $ 1,105.00 | $ 4,310.00 |
| Auto & Truck Expense | $ 3,814.00 | $ 3,657.00 | $ 3,699.00 | $ 3,170.00 | $ 14,340.00 |
| Utilities | $ 3,270.00 | $ 3,270.00 | $ 3,270.00 | $ 3,270.00 | $ 13,080.00 |
| Bank Service Fees | $ 1,027.00 | $ 984.00 | $ 996.00 | $ 850.00 | $ 3,860.00 |
| Travel and Entertainment | $ 43.00 | $ 43.00 | $ 42.00 | $ 42.00 | $ 170.00 |
| Repairs & Maintenance | $ 175.00 | $ 175.00 | $ 175.00 | $ 175.00 | $ 700.00 |
| Advertising | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 | $ 400.00 |
| Supplies & Office | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 600.00 |
| Professional Fees | $ 0.00 | $ 250.00 | $ 250.00 | $ 0.00 | $ 500.00 |
| Bankruptcy Fee | $ 650.00 | $ 650.00 | $ 650.00 | $ 650.00 | $ 2,600.00 |
| Total Operating Expense | $ 11,594.00 | $ 11,632.00 | $ 12,484.00 | $ 12,939.00 | $ 48,649.00 |
| Net Cash Flow | $ 7,612.00 | $ 6,779.00 | $ 6,144.00 | $ 3,016.00 | $ 23,551.00 |

See the summary of significant projection assumptions and accountants' report.

Projected Cash Flow Summary
P&S Distributors, Inc.
For the Year Ending 2015

| Description | 1Q 2015 | 2Q 2015 | 3Q 2015 | 4Q 2015 | Year 3 FYE 12/31/2015 |
|---|---|---|---|---|---|
| Sale | $ 68,309.00 | $ 65,484.00 | $ 66,254.00 | $ 56,753.00 | $ 256,800.00 |
| Cost of Goods Sold | $ 48,638.00 | $ 46,627.00 | $ 47,175.00 | $ 40,410.00 | $ 182,850.00 |
| Gross Margin | $ 19,671.00 | $ 18,857.00 | $ 19,079.00 | $ 16,343.00 | $ 73,950.00 |
| *Operating Expenses* | | | | | |
| Sales Tax | $ 309.00 | $ 296.00 | $ 299.00 | $ 256.00 | $ 1,160.00 |
| Property Tax | $ 0.00 | $ 0.00 | $ 740.00 | $ 2,160.00 | $ 2,900.00 |
| Rent & Lease Expense | $ 1,014.00 | $ 1,015.00 | $ 1,015.00 | $ 1,015.00 | $ 4,059.00 |
| Insurance-Auto | $ 1,105.00 | $ 1,105.00 | $ 1,105.00 | $ 1,105.00 | $ 4,420.00 |
| Auto & Truck Expense | $ 3,910.00 | $ 3,749.00 | $ 3,793.00 | $ 3,248.00 | $ 14,700.00 |
| Utilities | $ 3,353.00 | $ 3,352.00 | $ 3,352.00 | $ 3,253.00 | $ 13,410.00 |
| Bank Service Fees | $ 1,051.00 | $ 1,007.00 | $ 1,019.00 | $ 873.00 | $ 3,950.00 |
| Travel and Entertainment | $ 47.00 | $ 48.00 | $ 48.00 | $ 47.00 | $ 190.00 |
| Repairs & Maintenance | $ 225.00 | $ 225.00 | $ 225.00 | $ 225.00 | $ 900.00 |
| Advertising | $ 125.00 | $ 125.00 | $ 125.00 | $ 125.00 | $ 500.00 |
| Supplies & Office | $ 153.00 | $ 154.00 | $ 154.00 | $ 154.00 | $ 615.00 |
| Professional Fees | $ 0.00 | $ 300.00 | $ 300.00 | $ 0.00 | $ 600.00 |
| Bankruptcy Fee | $ 650.00 | $ 650.00 | $ 650.00 | $ 650.00 | $ 2,600.00 |
| Total Operating Expense | $ 11,942.00 | $ 12,026.00 | $ 12,825.00 | $ 12,211.00 | $ 50,004.00 |
| Net Cash Flow | $ 7,729.00 | $ 6,83100 | $ 6,254.00 | $ 3,132.00 | $ 23,946.00 |

See the summary of significant projection assumptions and accountants' report.

Projected Cash Flow Summary
P&S Distributors, Inc.
For the Year Ending 2016

| Description | 1Q 2016 | 2Q 2016 | 3Q 2016 | 4Q 2016 | Year 4 FYE 12/31/2016 |
|---|---|---|---|---|---|
| Sale | $ 70,011.00 | $ 67,116.00 | $ 67,906.00 | $ 58,167.00 | $ 263,200.00 |
| Cost of Goods Sold | $ 49,848.00 | $ 47,787.00 | $ 48,349.00 | $ 41,416.00 | $ 187,400.00 |
| Gross Margin | $ 20,163.00 | $ 19,329.00 | $ 19,557.00 | $ 16,751.00 | $ 75,800.00 |
| *Operating Expenses* Sales Tax | $ 317.00 | $ 303.00 | $ 307.00 | $ 263.00 | $ 1,190.00 |
| Property Tax | $ 0.00 | $ 0.00 | $ 740.00 | $ 2,160.00 | $ 2,900.00 |
| Rent & Lease Expense | $ 1,014.00 | $ 1,015.00 | $ 1,015.00 | $ 1,015.00 | $ 4,059.00 |
| Insurance-Auto | $ 1,132.00 | $ 1,133.00 | $ 1,132.00 | $ 1,133.00 | $ 4,530.00 |
| Auto & Truck Expense | $ 4,009.00 | $ 3,843.00 | $ 3,888.00 | $ 3,330.00 | $ 15,070.00 |
| Utilities | $ 3,435.00 | $ 3,435.00 | $ 3,435.00 | $ 3,435.00 | $ 13,740.00 |
| Bank Service Fees | $ 1,077.00 | $ 1,033.00 | $ 1,045.00 | $ 895.00 | $ 4,050.00 |
| Travel and Entertainment | $ 53.00 | $ 52.00 | $ 53.00 | $ 52.00 | $ 210.00 |
| Repairs & Maintenance | $ 275.00 | $ 275.00 | $ 275.00 | $ 275.00 | $ 1,100.00 |
| Advertising | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 600.00 |
| Supplies & Office | $ 158.00 | $ 159.00 | $ 158.00 | $ 157.00 | $ 630.00 |
| Professional Fees | $ 0.00 | $ 350.00 | $ 350.00 | $ 0.00 | $ 700.00 |
| Bankruptcy Fee | $ 650.00 | $ 650.00 | $ 650.00 | $ 650.00 | $ 2,600.00 |
| Total Operating Expense | $ 12,270.00 | $ 12,396.00 | $ 13,198.00 | $ 13,515.00 | $ 51,379.00 |
| Net Cash Flow | $ 7,893.00 | $ 6,933.00 | $ 6,359.00 | $ 3,236.00 | $ 24,421.00 |

See the summary of significant projection assumptions and accountants' report.

Projected Cash Flow Summary
P&S Distributors, Inc.
For the Year Ending 2017

| Description | 1Q 2017 | 2Q 2017 | 3Q 2017 | 4Q 2017 | Year 5 FYE 12/31/2017 |
|---|---|---|---|---|---|
| Sale | $ 71,767.00 | $ 68,799.00 | $ 68,608.00 | $ 59,626.00 | $ 269,800.00 |
| Cost of Goods Sold | $ 51,099.00 | $ 48,986.00 | $ 49,562.00 | $ 42,453.00 | $ 192,100.00 |
| Gross Margin | $ 20,668.00 | $ 19,813.00 | $ 20,046.00 | $ 17,173.00 | $ 77,700.00 |
| *Operating Expenses* Sales Tax | $ 323.00 | $ 310.00 | $ 313.00 | $ 269.00 | $ 1,215.00 |
| Property Tax | $ 0.00 | $ 0.00 | $ 740.00 | $ 2,160.00 | $ 2,900.00 |
| Rent & Lease Expense | $ 1,014.00 | $ 1,015.00 | $ 1,015.00 | $ 1,015.00 | $ 4,059.00 |
| Insurance-Auto | $ 1,162.00 | $ 1,163.00 | $ 1,162.00 | $ 1,163.00 | $ 4,650.00 |
| Auto & Truck Expense | $ 4,110.00 | $ 3,940.00 | $ 3,986.00 | $ 3,414.00 | $ 15,450.00 |
| Utilities | $ 3,520.00 | $ 3,520.00 | $ 3,520.00 | $ 3,520.00 | $ 14,080.00 |
| Bank Service Fees | $ 1,105.00 | $ 1,060.00 | $ 1,072.00 | $ 918.00 | $ 4,155.00 |
| Travel and Entertainment | $ 58.00 | $ 57.00 | $ 58.00 | $ 57.00 | $ 230.00 |
| Repairs & Maintenance | $ 325.00 | $ 325.00 | $ 325.00 | $ 325.00 | $ 1,300.00 |
| Advertising | $ 175.00 | $ 175.00 | $ 175.00 | $ 175.00 | $ 700.00 |
| Supplies & Office | $ 162.00 | $ 163.00 | $ 162.00 | $ 163.00 | $ 650.00 |
| Professional Fees | $ 0.00 | $ 400.00 | $ 400.00 | $ 0.00 | $ 800.00 |
| Bankruptcy Fee | $ 650.00 | $ 650.00 | $ 650.00 | $ 650.00 | $ 2,600.00 |
| Total Operating Expense | $ 12,604.00 | $ 12,778.00 | $ 13,578.00 | $ 13,829.00 | $ 52,789.00 |
| Net Cash Flow | $ 8,064.00 | $ 7,035.00 | $ 6,568.00 | $ 3,344.00 | $ 24,911.00 |

See the summary of significant projection assumptions and accountants' report.

# EXHIBIT D

## VanMassenhove, Kearly, Taphouse & Faulman, P.C.
### CERTIFIED PUBLIC ACCOUNTANTS
120 N. RIPLEY STREET
ALPENA, MICHIGAN 49707-2967

Gary C. VanMassenhove, CPA
J. Michael Kearly, CPA
Jeffrey A. Taphouse, CPA
John D. Faulman, CPA

Members: American Institute of CPA's
Michigan Association of CPA's
TELEPHONE: (989) 354-2111
FAX: (989) 356-3590
E-MAIL: vktf@frontier.com

# P & S DISTRIBUTORS, INC.

## SCHEDULES OF PROJECTED FINANCIAL INFORMATION

### FOR THE FIVE YEARS ENDING
### DECEMBER 31, 2017

VANMASSENHOVE, KEARLY, TAPHOUSE & FAULMAN, P.C.
**CERTIFIED PUBLIC ACCOUNTANTS**
120 N. RIPLEY STREET
ALPENA, MICHIGAN 49707-2967

Gary C. VanMassenhove, CPA
J. Michael Kearly, CPA
Jeffrey A. Taphouse, CPA
John D. Faulman, CPA

Members: American Institute of CPA's
Michigan Association of CPA's
TELEPHONE: (989) 354-2111
FAX: (989) 356-3590
E-MAIL: vktf@frontier.com

## ACCOUNTANT'S COMPILATION REPORT

P & S Distributors Inc.
2612 US Highway 23 S
Alpena, MI 49707

We have compiled the accompanying schedules of projected cash flows available for debt service – income tax basis of P & S Distributors Inc. for the five years ending December 31, 2017, in accordance with attestation standards established by the American Institute of Certified Public Accountants. The accompanying schedules present, to the best of management's knowledge and belief, the entity's income tax basis projected cash flows available for debt service for the five years ending December 31, 2017, if the hypothetical assumptions described in Note A are attained. The accompanying projection schedules were prepared for the Company to use in Chapter 11 Bankruptcy proceedings.

A compilation is limited to presenting projected information that is the representation of management and does not include evaluation of the support for the assumptions underlying such information. We have not examined the schedules and, accordingly, do not express an opinion or any other form of assurance on the accompanying schedules or assumptions. Furthermore, even if the entity attains the hypothetical assumptions described in Note A there will usually be differences between the projected and actual results because events and circumstances frequently do not occur as expected, and those differences may be material. We have no responsibility to update this report for events and circumstances occurring after the date of this report.

The accompanying projected schedules and this report are intended solely for the information and use of P & S Distributors, Inc. and are not intended to be and should not be used by anyone other than theses specified parties.

*VanMassenhove, Kearly, Taphouse + Faulman, P.C.*

May 8, 2013

Projected Cash Flow Summary
P&S Distributors, Inc.
For the Five Year Period – 2013 through 2017

Annual Sales Increase

| Description | Year 1 FYE 12/31/2013 | Year 2 FYE 12/31/2014 | Year 3 FYE 12/31/2015 | Year 4 FYE 12/31/2016 | Year 5 FYE 12/31/2017 | Total |
|---|---|---|---|---|---|---|
| Sales | $244,500.00 | $250,600.00 | $256,800.00 | $263,200.00 | $269,800.00 | $1,284,900.00 |
| Cost of Goods Sold | $174,100.00 | $178,400.00 | $182,850.00 | $187,400.00 | $192,100.00 | $ 914,850.00 |
| Gross Margin | $ 70,400.00 | $ 72,200.00 | $ 73,950.00 | $ 75,800.00 | $ 77,700.00 | $ 370,050.00 |
| *Operating Expenses* | | | | | | |
| Sales Tax | $ 1,100.00 | $ 1,130.00 | $ 1,160.00 | $ 1,190.00 | $ 1,215.00 | $ 5,795.00 |
| Property Tax | $ 2,900.00 | $ 2,900.00 | $ 2,900.00 | $ 2,900.00 | $ 2,900.00 | $ 14,500.00 |
| Rent & Lease Expense | $ 4,059.00 | $ 4,059.00 | $ 4,059.00 | $ 4,059.00 | $ 4,059.00 | $ 20,295.00 |
| Insurance-Auto | $ 4,200.00 | $ 4,310.00 | $ 4,420.00 | $ 4,530.00 | $ 4,650.00 | $ 22,110.00 |
| Auto & Truck | $ 13,990.00 | $ 14,340.00 | $ 14,700.00 | $ 15,070.00 | $ 15,450.00 | $ 73,550.00 |
| Utilities | $ 12,760.00 | $ 13,080.00 | $ 13,410.00 | $ 13,740.00 | $ 14,080.00 | $ 67,070.00 |
| Bank Service Fees | $ 3,760.00 | $ 3,860.00 | $ 3,950.00 | $ 4,050.00 | $ 4,155.00 | $ 19,775.00 |
| Travel & Entertainment | $ 150.00 | $ 170.00 | $ 190.00 | $ 210.00 | $ 230.00 | $ 950.00 |
| Repairs & Maintenance | $ 500.00 | $ 700.00 | $ 900.00 | $ 1,100.00 | $ 1,300.00 | $ 4,500.00 |
| Advertising | $ 300.00 | $ 400.00 | $ 500.00 | $ 600.00 | $ 700.00 | $ 2,500.00 |
| Supplies & Office | $ 500.00 | $ 600.00 | $ 615.00 | $ 630.00 | $ 650.00 | $ 3,085.00 |
| Professional Fees | $ 400.00 | $ 500.00 | $ 600.00 | $ 700.00 | $ 800.00 | $ 3,000.00 |
| Bankruptcy Fee | $ 2,600.00 | $ 2,600.00 | $ 2,600.00 | $ 2,600.00 | $ 2,600.00 | $ 13,000.00 |
| Total Operating Expense | $ 47,309.00 | $ 48,649.00 | $ 50,004.00 | $ 51,379.00 | $ 52,789.00 | $ 250,130.00 |
| Net Cash flow | $ 23,091.00 | $ 23,551.00 | $ 23,946.00 | $ 24,421.00 | $ 24,911.00 | $ 119,920.00 |

See the summary of significant projection assumptions and accountants' report.

Projected Cash Flow Summary
P&S Distributors, Inc.
For the Year Ending 2013

| Description | 1Q 2013 | 2Q 2013 | 3Q 2013 | 4Q 2013 | Year 1 FYE 12/31/2013 |
|---|---|---|---|---|---|
| Sale | $ 65,037.00 | $ 62,348.00 | $ 63,081.00 | $ 54,034.00 | $ 244,500.00 |
| Cost of Goods Sold | $ 46,310.00 | $ 44,396.00 | $ 44,918.00 | $ 38,476.00 | $ 174,100.00 |
| Gross Margin | $ 18,727.00 | $ 17,952.00 | $ 18,163.00 | $ 15,558.00 | $ 70,400.00 |
| *Operating Expenses* | | | | | |
| Sales Tax | $ 293.00 | $ 280.00 | $ 284.00 | $ 243.00 | $ 1,100.00 |
| Property Tax | $ 0.00 | $ 0.00 | $ 740.00 | $ 2,160.00 | $ 2,900.00 |
| Rent & Lease Expense | $ 1,014.00 | $ 1,015.00 | $ 1,015.00 | $ 1,015.00 | $ 4,059.00 |
| Insurance-Auto | $ 1,050.00 | $ 1,050.00 | $ 1,050.00 | $ 1,050.00 | $ 4,200.00 |
| Auto & Truck Expense | $ 3,721.00 | $ 3,567.00 | $ 3,609.00 | $ 3,093.00 | $ 13,990.00 |
| Utilities | $ 3,190.00 | $ 3,190.00 | $ 3,190.00 | $ 3,190.00 | $ 12,760.00 |
| Bank Service Fees | $ 1,000.00 | $ 959.00 | $ 970.00 | $ 831.00 | $ 3,760.00 |
| Travel and Entertainment | $ 38.00 | $ 38.00 | $ 37.00 | $ 37.00 | $ 150.00 |
| Repairs & Maintenance | $ 125.00 | $ 125.00 | $ 125.00 | $ 125.00 | $ 500.00 |
| Advertising | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 300.00 |
| Supplies & Office | $ 148.00 | $ 147.00 | $ 148.00 | $ 147.00 | $ 590.00 |
| Professional Fees | $ 0.00 | $ 200.00 | $ 200.00 | $ 0.00 | $ 400.00 |
| Bankruptcy Fee | $ 650.00 | $ 650.00 | $ 650.00 | $ 650.00 | $ 2,600.00 |
| Total Operating Expense | $ 11,304.00 | $ 11,296.00 | $ 12,093.00 | $ 12,616.00 | $ 47,309.00 |
| Net Cash Flow | $ 7,423.00 | $ 6,656.00 | $ 6,070.00 | $ 2,942.00 | $ 23,091.00 |

See the summary of significant projection assumptions and accountants' report.

Page 3 of 9

Projected Cash Flow Summary
P&S Distributors, Inc.
For the Year Ending 2014

| Description | 1Q 2014 | 2Q 2014 | 3Q 2014 | 4Q 2014 | Year 2 FYE 12/31/2014 |
|---|---|---|---|---|---|
| Sale | $ 65,660.00 | $ 63,903.00 | $ 64,655.00 | $ 55,382.00 | $ 250,600.00 |
| Cost of Goods Sold | $ 47,454.00 | $ 45,492.00 | $ 46,027.00 | $ 39,427.00 | $ 178,400.00 |
| Gross Margin | $ 19,206.00 | $ 18,411.00 | $ 18,628.00 | $ 15,955.00 | $ 72,200.00 |
| *Operating Expenses* Sales Tax | $ 301.00 | $ 288.00 | $ 292.00 | $ 249.00 | $ 1,130.00 |
| Property Tax | $ 0.00 | $ 0.00 | $ 740.00 | $ 2,160.00 | $ 2,900.00 |
| Rent & Lease Expense | $ 1,014.00 | $ 1,015.00 | $ 1,015.00 | $ 1,015.00 | $ 4,059.00 |
| Insurance-Auto | $ 1,050.00 | $ 1,050.00 | $ 1,105.00 | $ 1,105.00 | $ 4,310.00 |
| Auto & Truck Expense | $ 3,814.00 | $ 3,657.00 | $ 3,699.00 | $ 3,170.00 | $ 14,340.00 |
| Utilities | $ 3,270.00 | $ 3,270.00 | $ 3,270.00 | $ 3,270.00 | $ 13,080.00 |
| Bank Service Fees | $ 1,027.00 | $ 984.00 | $ 996.00 | $ 853.00 | $ 3,860.00 |
| Travel and Entertainment | $ 43.00 | $ 43.00 | $ 42.00 | $ 42.00 | $ 170.00 |
| Repairs & Maintenance | $ 175.00 | $ 175.00 | $ 175.00 | $ 175.00 | $ 700.00 |
| Advertising | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 | $ 400.00 |
| Supplies & Office | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 600.00 |
| Professional Fees | $ 0.00 | $ 250.00 | $ 250.00 | $ 0.00 | $ 500.00 |
| Bankruptcy Fee | $ 650.00 | $ 650.00 | $ 650.00 | $ 650.00 | $ 2,600.00 |
| Total Operating Expense | $ 11,594.00 | $ 11,632.00 | $ 12,484.00 | $ 12,939.00 | $ 48,649.00 |
| Net Cash Flow | $ 7,612.00 | $ 6,779.00 | $ 6,144.00 | $ 3,016.00 | $ 23,551.00 |

See the summary of significant projection assumptions and accountants' report.

Projected Cash Flow Summary
P&S Distributors, Inc.
For the Year Ending 2015

| Description | 1Q 2015 | 2Q 2015 | 3Q 2015 | 4Q 2015 | Year 3 FYE 12/31/2015 |
|---|---|---|---|---|---|
| Sale | $ 68,309.00 | $ 65,484.00 | $ 66,254.00 | $ 56,753.00 | $ 256,800.00 |
| Cost of Goods Sold | $ 48,638.00 | $ 46,627.00 | $ 47,175.00 | $ 40,410.00 | $ 182,850.00 |
| Gross Margin | $ 19,671.00 | $ 18,857.00 | $ 19,079.00 | $ 16,343.00 | $ 73,950.00 |
| *Operating Expenses* Sales Tax | $ 309.00 | $ 296.00 | $ 299.00 | $ 256.00 | $ 1,160.00 |
| Property Tax | $ 0.00 | $ 0.00 | $ 740.00 | $ 2,160.00 | $ 2,900.00 |
| Rent & Lease Expense | $ 1,014.00 | $ 1,015.00 | $ 1,015.00 | $ 1,015.00 | $ 4,059.00 |
| Insurance-Auto | $ 1,105.00 | $ 1,105.00 | $ 1,105.00 | $ 1,105.00 | $ 4,420.00 |
| Auto & Truck Expense | $ 3,910.00 | $ 3,749.00 | $ 3,793.00 | $ 3,248.00 | $ 14,700.00 |
| Utilities | $ 3,353.00 | $ 3,352.00 | $ 3,352.00 | $ 3,353.00 | $ 13,410.00 |
| Bank Service Fees | $ 1,051.00 | $ 1,007.00 | $ 1,019.00 | $ 873.00 | $ 3,950.00 |
| Travel and Entertainment | $ 47.00 | $ 48.00 | $ 48.00 | $ 47.00 | $ 190.00 |
| Repairs & Maintenance | $ 225.00 | $ 225.00 | $ 225.00 | $ 225.00 | $ 900.00 |
| Advertising | $ 125.00 | $ 125.00 | $ 125.00 | $ 125.00 | $ 500.00 |
| Supplies & Office | $ 153.00 | $ 154.00 | $ 154.00 | $ 154.00 | $ 615.00 |
| Professional Fees | $ 0.00 | $ 300.00 | $ 300.00 | $ 0.00 | $ 600.00 |
| Bankruptcy Fee | $ 650.00 | $ 650.00 | $ 650.00 | $ 650.00 | $ 2,600.00 |
| Total Operating Expense | $ 11,942.00 | $ 12,026.00 | $ 12,825.00 | $ 13,211.00 | $ 50,004.00 |
| Net Cash Flow | $ 7,729.00 | $ 6,831.00 | $ 6,254.00 | $ 3,132.00 | $ 23,946.00 |

See the summary of significant projection assumptions and accountants' report.

Pagd 5 of 9

Projected Cash Flow Summary
P&S Distributors, Inc.
For the Year Ending 2016

| Description | 1Q 2016 | 2Q 2016 | 3Q 2016 | 4Q 2016 | Year 4 FYE 12/31/2016 |
|---|---|---|---|---|---|
| Sale | $ 70,011.00 | $ 67,116.00 | $ 67,906.00 | $ 58,167.00 | $ 263,200.00 |
| Cost of Goods Sold | $ 49,848.00 | $ 47,787.00 | $ 48,349.00 | $ 41,416.00 | $ 187,400.00 |
| Gross Margin | $ 20,163.00 | $ 19,329.00 | $ 19,557.00 | $ 16,751.00 | $ 75,800.00 |
| *Operating Expenses* | | | | | |
| Sales Tax | $ 317.00 | $ 303.00 | $ 307.00 | $ 263.00 | $ 1,190.00 |
| Property Tax | $ 0.00 | $ 0.00 | $ 740.00 | $ 2,160.00 | $ 2,900.00 |
| Rent & Lease Expense | $ 1,014.00 | $ 1,015.00 | $ 1,015.00 | $ 1,015.00 | $ 4,059.00 |
| Insurance-Auto | $ 1,132.00 | $ 1,133.00 | $ 1,132.00 | $ 1,133.00 | $ 4,530.00 |
| Auto & Truck Expense | $ 4,009.00 | $ 3,843.00 | $ 3,888.00 | $ 3,330.00 | $ 15,070.00 |
| Utilities | $ 3,435.00 | $ 3,435.00 | $ 3,435.00 | $ 3,435.00 | $ 13,740.00 |
| Bank Service Fees | $ 1,077.00 | $ 1,033.00 | $ 1,045.00 | $ 895.00 | $ 4,050.00 |
| Travel and Entertainment | $ 53.00 | $ 52.00 | $ 53.00 | $ 52.00 | $ 210.00 |
| Repairs & Maintenance | $ 275.00 | $ 275.00 | $ 275.00 | $ 275.00 | $ 1,100.00 |
| Advertising | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 600.00 |
| Supplies & Office | $ 158.00 | $ 157.00 | $ 158.00 | $ 157.00 | $ 630.00 |
| Professional Fees | $ 0.00 | $ 350.00 | $ 350.00 | $ 0.00 | $ 700.00 |
| Bankruptcy Fee | $ 650.00 | $ 650.00 | $ 650.00 | $ 650.00 | $ 2,600.00 |
| Total Operating Expense | $ 12,270.00 | $ 12,396.00 | $ 13,198.00 | $ 13,515.00 | $ 51,379.00 |
| Net Cash Flow | $ 7,893.00 | $ 6,933.00 | $ 6,359.00 | $ 3,236.00 | $ 24,421.00 |

See the summary of significant projection assumptions and accountants' report.

Projected Cash Flow Summary
P&S Distributors, Inc.
For the Year Ending 2017

| Description | 1Q 2017 | 2Q 2017 | 3Q 2017 | 4Q 2017 | Year 5 FYE 12/31/2017 |
|---|---|---|---|---|---|
| Sale | $ 71,767.00 | $ 68,799.00 | $ 68,608.00 | $ 59,626.00 | $ 269,800.00 |
| Cost of Goods Sold | $ 51,099.00 | $ 48,986.00 | $ 49,562.00 | $ 42,453.00 | $ 192,100.00 |
| Gross Margin | $ 20,668.00 | $ 19,813.00 | $ 20,046.00 | $ 17,173.00 | $ 77,700.00 |
| *Operating Expenses* Sales Tax | $ 323.00 | $ 310.00 | $ 313.00 | $ 269.00 | $ 1,215.00 |
| Property Tax | $ 0.00 | $ 0.00 | $ 740.00 | $ 2,160.00 | $ 2,900.00 |
| Rent & Lease Expense | $ 1,014.00 | $ 1,015.00 | $ 1,015.00 | $ 1,015.00 | $ 4,059.00 |
| Insurance-Auto | $ 1,162.00 | $ 1,163.00 | $ 1,162.00 | $ 1,163.00 | $ 4,650.00 |
| Auto & Truck Expense | $ 4,110.00 | $ 3,940.00 | $ 3,986.00 | $ 3,414.00 | $ 15,450.00 |
| Utilities | $ 3,520.00 | $ 3,520.00 | $ 3,520.00 | $ 3,520.00 | $ 14,080.00 |
| Bank Service Fees | $ 1,105.00 | $ 1,060.00 | $ 1,072.00 | $ 918.00 | $ 4,155.00 |
| Travel and Entertainment | $ 58.00 | $ 57.00 | $ 58.00 | $ 57.00 | $ 230.00 |
| Repairs & Maintenance | $ 325.00 | $ 325.00 | $ 325.00 | $ 325.00 | $ 1,300.00 |
| Advertising | $ 175.00 | $ 175.00 | $ 175.00 | $ 175.00 | $ 700.00 |
| Supplies & Office | $ 162.00 | $ 163.00 | $ 162.00 | $ 163.00 | $ 650.00 |
| Professional Fees | $ 0.00 | $ 400.00 | $ 400.00 | $ 0.00 | $ 800.00 |
| Bankruptcy Fee | $ 650.00 | $ 650.00 | $ 650.00 | $ 650.00 | $ 2,600.00 |
| Total Operating Expense | $ 12,604.00 | $ 12,778.00 | $ 13,578.00 | $ 13,829.00 | $ 52,789.00 |
| Net Cash Flow | $ 8,064.00 | $ 7,035.00 | $ 6,468.00 | $ 3,344.00 | $ 24,911.00 |

See the summary of significant projection assumptions and accountants' report.

<u>P & S Distributors Inc.</u>

<u>SUMMARY OF SIGNIFICANT ASSUMPTIONS AND ACCOUTING POLICIES
USED IN PREPARATION OF SCHEDULE OF PROJECTED FINANCIAL
INFORMATION</u>

NOTE A - NATURE OF PROJECTIONS AND SIGNIFICANT ACCOUNTING POLICIES

The financial projections are based on hypothetical assumptions as to receipts and disbursements that are described further in Note B. Accordingly, the projection reflects management's judgment as of December 31, 2012, the date of the projection, of the expected conditions and their expected course of action if those hypothetical assumptions are attained. The projection is designed to provide information to the companies for use in Chapter 11 bankruptcy proceedings and should not be used for any other purpose.

Even if the hypothetical assumptions are attained, there will usually be differences between the projected and actual results because events and circumstances frequently do not occur as expected, and those differences may be material.

*Basis of Accounting*

The Schedules of Projected Cash Flow Summary reflect the expected results of operations on an income tax basis of accounting which differs from generally accepted accounting principles.

NOTE B - PROJECTION ASSUMPTIONS

The projection schedules present, to the best of management's knowledge and belief, the expected income resulting from operations and resulting cash flows available for debt service prepared on the income tax basis. The projection period is five years. Amounts have been rounded to reflect that they are estimated.

The projected financial information for the projection periods includes the following assumptions:

*Revenues*

For the five-year projection period, it is assumed that revenue are based on historical data adjusted for an 18% price increase on bolts, which is approximately 50% of company sales.

See the Accompanying Accountants Compilation Report.

## SUMMARY OF SIGNIFICANT ASSUMPTIONS AND ACCOUTING POLICIES USED IN PREPARATION OF SCHEDULE OF PROJECTED FINANCIAL INFORMATION
### Continued

### Cost of Sales

*Cost of Goods Sold:* Cost of goods sold are based on projected sales. These cost percentages are historically based on prior years company results, adjusted for a recent 7% cost to purchase decrease on paper sales, which is approximately 50% of company sales.

### Deprecation

Depreciation is not reflected on the cash flow projections. Additional purchases of major fixed assets will be minimal; therefore, replacement furniture, fixtures, and equipment are not included in future years.

### Auto and Truck Expense

Vehicle operations are based on prior operations reduced by 1.52 % as management has instituted a reduction in trips Sault Ste Marie to bi-weekly versus weekly and saving from purchasing a bridge card by same tool fees.

### Rent Expense

Rent expense is projected at $338/monthly or $4,059/annually paid to Unites States Industrial Distributors, Inc. This is sufficient to cover principal and interest payments on the mortgage at that entity.

### Income Taxes

The company stockholder is taxed individually on the net earnings of entity as it is a Sub-Chapter S Corporation. Therefore, no cash flow is required to be reflected on this projection.

### Bankruptcy Fee

The quarterly fee for administration is $650, or $2,600 annually.

### Other

For all others expenses of operation, costs are based on prior experience and management's estimates.

# EXHIBIT E

P&S Distributors, Inc.
For the Years – 2010 through 2012 and through March 2013

Annual Sales

| Description | FYE 12/31/2010 | FYE 12/31/2011 | FYE 12/31/2012 | 2013 Through 3/31/2013 |
|---|---|---|---|---|
| Sales | $346,794.00 | $184,817.00 | $161,663.00 | $38,389.00 |
| Cost of Goods Sold | $249,324.00 | $148,674.00 | $128,599.00 | $27,357.00 |
| | | | | |
| Gross Margin | $97,47.00 | $36,143.00 | $33,064.00 | $11,032.00 |
| *Operating Expenses* | | | | |
| | | | | |
| Salaries and wages | $5,880.00 | $0.00 | $0.00 | $0.00 |
| Sales Tax | $872.00 | $1,644.00 | $741.00 | $200.00 |
| Property Tax | $0.00 | $0.00 | $0.00 | $0.00 |
| Rent & Lease Expense | $0.00 | $4,058.00 | $4,058.00 | $1,014.00 |
| Insurance-Auto | $4,102.00 | $4,098.00 | $4,267.00 | $1,085.00 |
| Auto & Truck | $16,218.00 | $18,025.00 | $16,346.00 | $4,620.00 |
| Utilities | $9,094.00 | $10,448.00 | $9,731.00 | $2,417.00 |
| Bank Service Fees | $285.00 | $3,287.00 | $2,097.00 | $98.00 |
| Travel & Entertainment | $0.00 | $0.00 | $0.00 | $0.00 |
| Repairs & Maintenance | $0.00 | $0.00 | $0.00 | $0.00 |
| Advertising | $10.00 | $0.00 | $0.00 | $0.00 |
| Supplies & Office | $1,558.00 | $437.00 | $385.00 | $164.00 |
| Depreciation | $9,093.00 | $0.00 | $0.00 | $650.00 |
| Other Deductions/ Expenses | $8,839.00 | $0.00 | $1,000.00 | $0.00 |
| Bankruptcy Fee | $0.00 | $0.00 | $650.00 | $650.00 |
| | | | | |
| Total Operating Expense | $55,951.00 | $41,997.00 | $39,275.00 | $10,251.00 |
| | | | | |
| Net Cash flow | $41,520.00 | ($5,854.00) | ($6,211.00) | $781.00 |